I'd like to reserve five minutes for rebuttal. Your Honors, may it please the Court, my name is Alfred Joseph Fleur with the law firm Francis Alexander, LLC. I represent Sound and Color, LLC, and with me here today I have Jordan Vincent, one of the owners of Sound and Color, LLC, and also Christopher Miranda, who have joined me here today. Roscoe Banloi could not be present, but I believe he's watching on the feed. So essentially what this case comes down to is that my clients wrote a song in 2015 called Dancing with a Stranger, or alternatively Dancing with Strangers, which had a part of its chorus was the hook where they sing the line Dancing with a Stranger in a certain particular way. About four years later, Sam Smith, very famous artist, puts out a song also called Dancing with a Stranger, and the hook also, the hook and the chorus also has the lyrics sung in a particular way, which we contend is substantially similar, the whole reason we're here, which we contend is also Dancing with a Stranger. There's no dispute the lyrics are identical in this hook. What it comes down to is the vocal melody and the elements of the vocal melody and some of the other musical characteristics, whether those elements are substantially similar. And what we have here is, in our point of view, just fundamentally, we have an expert dispute, this is a case, it's a close call, it's a case that fundamentally should have gone to the jury on substantial similarity. Little procedural background, we agreed up front, let's just do discovery on the extrinsic test for the copyright claim, we'll just do expert discovery and some additional discovery and then we'll just do summary judgment just on the extrinsic test. Now, just to be clear, what about originality? Even if it's substantially similar, doesn't there still need to be showing that it's original? Of course. Okay, so was that litigated below too? That was not really an issue that was in dispute, we, I believe the court in the summary judgment opinion said that it was original, you know, I did, the court said I'm not touching that issue. Sure. So that's why I'm wondering, if you prevail here, what happens next? You seem to be assuming it would just go to trial, but is that true? Are there not other defenses that could be interposed, including originality? There's numerous other defenses, for instance, they might claim independent creation that was explicitly disclaimed as part of the process. We'd also have to get into access, we'd also have to get into ownership of the copyright. We think that those are all pretty straightforward issues, and a lot of the issues are going to flow from the termination here, but certainly when we go back down, if we go back down, there will be other issues that we address. Originality I think is kind of baked in the cake here, to a degree, when it comes to substantial similarity. I'm not sure your opposing counsel would agree with that, but we'll hear from them on that. But we did, we did address it, and Judge Hughes' lower opinion, sorry, the tentative opinion, which I provided to the court, it started out by saying, well, plaintiff's expression isn't novel, therefore it's not protectable. And we pointed out in the oral argument, well, that's not the standard for copy. I mean, the procedure here, I guess the parties wanted to do it this way, to do substantial, you agreed on that. We stipulated to it, yes. Yeah, I mean, I'm not sure how, maybe that's how these cases are normally litigated, and you can tell us that, but I'm not sure how helpful it is to our review, in the sense that we're now presented with essentially one issue, if we agree with you, it goes back and there has to be, you know, there's still other parts of the claim that have to be fleshed out. So it could have been more helpful to have all of them, but I understand there might be reasons in the district court way, so if you and the district court thought the way you did it was better. It also comes into cost and fees, and the efficiency of the court. We in our point of view, we think that this is a very clearly on the extrinsic test, something that should go to the jury, and that, you know, we did not foresee that we'd be ending up in, you know, years of appellate procedure, but sometimes that's what happens, and we don't have clairvoyance about where it's going to go. But I do, the reason I say that originality was kind of baked in the cake is because the tentative opinion did say that our underlying expression was not protected, and we argued against that, and we pointed out, well, novelty is not the standard, and we have met the burden for originality. So I do think... What's the difference between this and Skidmore? The difference between this and Skidmore, there's many differences. Skidmore was dealing with the deposit copy issue. I think that defendants have mainly cited Skidmore in regards to its holding on selection and arrangement, and they have tried to extend Skidmore in a lot of ways to... I think they're trying to really get Skidmore, and I think it's inappropriate here. With Skidmore, Skidmore applies on its facts to Skidmore on selection and arrangement. It doesn't apply to this case. Selection and arrangement is a very well-known, recognized theory. We've cited Swirsky, Hananagi, I don't know if I'm pronouncing that correctly, but Hanagami came down in 2023 from this circuit. It was very, very clear that selection and arrangement is a valid method of proving substantial similarity in copyright cases. And so Skidmore was addressing the facts of Skidmore. We have the facts here. Another reason to distinguish Skidmore and kind of disregard the defendant's arguments on Skidmore is that in the middle of that case, the whole main holding of that case, as I would characterize it, is that the lower court in the middle of the case held that the released version of the plaintiff's song that was sent to the public, the full composition, that that wasn't at issue, that only the deposit copy, an incomplete written lead sheet that an employee of the author had written for him because the author didn't know how to the expression at issue. So the comparison and the selection and arrangement issue in Skidmore was, as the plaintiff said many, many times, very artificial. So that distinguishes Skidmore in a lot of ways. Here we don't have any of those deposit copy disputes about what's protected and not protected. We have my client's song, which was released in 2015, copyrighted before the lawsuit, and then we have the defendant's song, which was widely released and also copyrighted. So the issues in Skidmore, we don't really see it as being applicable here. And I know that defendant's briefing, you know, relies on Skidmore and it says that all these cases were overruled. But if you even look at Hanagami, Hanagami is very clear that to the extent the cases we rely on were overruled, they were on other grounds. So all the selection and arrangement stuff that we're relying on from Swirsky, for instance, or Metcalfe v. Bocco, that's all good law. How about Gray v. Hudson? How does that differ from this? Well, so in Gray v. Hudson, and that's the Katy Perry Dark Horse case, in that one, the reason it's different is because there they were using just a very simple eight-note ostinato where I think they referred to it at one point as a selection arrangement claim, but if you actually look at it, it really wasn't. Essentially, it was these repeating notes with a flat rhythm with almost no other originality onto it. And the court there said, this is a basic building block of music. That's an originality case. Well, yes. And what the court there said is that this is a basic building block of music, and therefore there's only a few ways to express this, almost getting into thin copyright, we're not going to allow a substantial similarity claim and allow you to monopolize a building block of  Those concerns are absolutely not present here. We have, we have, there's many hooks of similar length in pop music. I've got you, babe, you know, burning down the house. We cite many in our briefing that if this was afforded thin copyright or a hook of this length and complexity was held not to be, have broad protection under copyright law, that you're essentially wiping out vast swaths of copyright protection. I have a question on the thin versus broad, does the court, does a court need to decide that sort of as a threshold issue? To some degree, but I think it's also a factual dispute. So I'm not, I think it depends on what part of the case you're talking about. But in this case, I don't think it's an issue at all. Because if you think copyright, you know, the case everyone thinks about is you take a picture of a vodka bottle. If someone else takes a picture of the same vodka bottle but a different angle, you know, is that copyright infringement? And the court's saying no. There's very limited ways to express that idea, a picture of a vodka bottle. Here with music, except for the most simple basic building blocks, lichen, gray, V. Hudson, there's almost an infinite number of ways to make that expression. And in this case, and we put it in our briefing, the defendants came up with over 50 pieces of prior art. They couldn't find anywhere in the selection, in that our song selection and arrangement appeared in the prior art. The only thing even remotely similar in the prior or subsequent art is our song and the defendant's song. And the court, sorry. No, go ahead. The court, the court in its opinion said, you know, it did say, yeah, I don't see anything in the prior art that really looks like plaintiff's song. The counsel, both sides have presented experts with all sorts of similarities and differences, you know, using phrases, metrical placement, melodic contours. If I put to you what are the two or three best similarities that you have, what would you, what would you point to for a layman? Sure. And I'll quote the defense expert, Dr. Ferreira, on the last page of his report. After spending hundreds of pages saying everything is different, everything is different. He very vaguely says, and there are some melodic and rhythmic similarities, but they're all commonplace and we don't really have to consider them because they're commonplace. And so really, in our view, these are very similar, almost strikingly similar pieces of music. But the actual elements, the actual elements, because I think I know where your honor's going, it's one, the lyrics overlaid on top of the pitch sequence, then the metric placement of the syllables, okay, which is in large part governed by the rhythm. So really, we're talking about the whole kit and caboodle here. And as Dr. Stewart, our expert, said, basically what you're looking at is very similar pieces of music, not completely identical, but very similar. And defendants or plaintiffs, depending, it's all relative, is slightly shifted. But otherwise, it's very much the same, except for the passing notes that we address in our briefing. So would you agree that the lyrics are really the key piece, that if it was just these notes that are the same in rhythm in the two songs with different lyrics, you wouldn't be here? I don't know if I would go that far, but I do think that the fact that the lyrics are the same, you know, look, this is not a claim. Some people bring claims to the central district and to this court, and they say, well, the title of that song is the same, and my title is the same. That's not this claim. I want to make that very clear. But having the lyrics be the exact same, we think, immeasurably does help our claim. The same notes, dying in the desert or flying to the moon, you really wouldn't have much of a claim, would you? I think there's less of a claim, but again, I don't want to make an outright statement. But the fact that the lyrics are the same here is, you know, it's very probative. But the lyrics are also not all that novel. I mean, there's lots of examples of songs that use that, sure, as lyrics. We've never claimed any protection over dancing with a stranger or dancing with an angel or any of the other examples that have appeared in the prior art, you know, dancing with a and then two syllables. We've never claimed that at all. We're pointing out that this particular hook in this particular arrangement, okay, appears in defendant's song. And that's what it comes down to. And really what we see here is that we have an expert dispute. Musicology is Byzantine. It's very hard for people to understand, including lawyers who deal with it all the time and judges. And, you know, I use an example or analogy, I think, in my reply brief. If you had a paragraph, right, and you just changed some words here and you shifted a sentence down, maybe added another sentence, and then you put in a few more flourishes or words here, but really it's still the same paragraph and someone just altered it to make it look a little different, you know, shifted it, if you will, are you really, do you really have a different piece of literature? The answer is that you really don't. The expression's still there. It's just been slightly modified. And that's what our expert contends happened. And do you have any case that talks about this kind of situation where the lyrics are the same and the notes are similar? Like any case we could look to that tells us how much weight to put on this same choice of lyrics? I'd, off the top of my head, I'd have to get back to you on that. However, Swirsky, I do think more or less fits this almost exactly like a glove in terms of the dispute about the pitch sequence, terms about the experts disagreeing about the significance or insignificance of various similarities and differences, and also regarding what's the proper role of the court in deciding these cases, especially at summary judgment. You know, we do think that Judge Sioux, I mean, respectfully, you know, there's disputes about this all the time. We do think he overstepped his role. And then his method, as we also, as you know from our briefing, we also think the method was wrong. We do think he applied thin copyright in all but name, which he admitted was inappropriate in the revised final opinion. And then he also engaged in filtering, where he did not, he discarded our elements. I just want to remind you about your rebuttal time. Do you want to save time for rebuttal? Yeah, we'll save a minute. Can I ask, do you mind if I ask? No, go ahead. Sure. I understand you don't have to show any kind of explicit copying. You can kind of infer that from the similarities. But is there anything in the record through discovery that's been developed to show whether the defendants had copies or used copies of your client's music in the process of creating their work? So there's some things that we allege in the pleadings about concerning, well, let me put it this way. One, our client's song was played on Spotify over 500,000 times, and it's 50,000 views on YouTube. I think by any measure, that satisfies widespread distribution, which is one method of access. So we think we're going to win on access regardless when we go back down. We also do have theories that the song was with management of the defendants' companies and the defendants themselves. So we do think that there is strong access. So has there been any actual discovery that the people about this?  No. Okay. I'll still give you some time for rebuttal, so we'll put a minute on the clock later. Thanks. Good morning, Your Honors. May it please the Court, Peter Anderson for the appellee, who consists largely of the actual writers of the defendant's song. I'd like to start briefly, before I get to Your Honor's questions, to just state what this case does not concern. Melody and lyrics of a whole song are protected, generally. This case does not include a claim of similarity in melody. Melody is a sequence of notes. Notes are comprised of pitches with a specific rhythm. There is no claim here that the lyrics as a whole, the song as a whole, or any melody, any lyric in the defendant's song infringes. This is all about slightly more than one measure taken out of the chorus that is set to the words, dancing with a stranger. Now, if I could start with Judge Bress's questions on originality and on the stipulation to bifurcate. The context is the following. Skidmore got rid of the inverse ratio rule. In a copyright case, you have to show copying occurred, and you have to show that the copying was a protected expression. Those two were linked for better than 50 years, which meant that in order to move for summary extrinsic test, you either had to concede access, or you had to do the discovery about access and go through the whole thing and then make a single motion. What Skidmore did by getting rid of the inverse ratio rule was allowed district courts, and we've done this several times, allowed district courts to focus on one specific issue. Can other works, substantially similar under the extrinsic test. Now, what plaintiff claims, and no one challenged originality of the plaintiff's song at this point. There is a serious question whether one measure set to the words, dancing with a stranger, is actually original, but the question- I'm not a musicologist. In fact, the word hook in this case was unknown to me previously, but that seems to be what everybody is arguing about, that just calling it one measure, I didn't really see a dispute where you said, oh, that's just a random measure. It's not that it is the hook that we should look at, it's repeated many times, it seems to be the theme. Is that fair? That's fair. It's in the chorus, and the chorus is repeated several times. However, it still is. The only claim similarity is that one measure, slightly more than a measure, and seven pitches in one work, and eight pitches in another. There's no claim that the notes are the same, the notes are different. There are only two notes that are the same, and they're not even the same, and they're separated by several notes. So- I'm sorry, help me on the terms here, because most of the talk in the brief is about pitch, and then you're saying notes, is the note, the G, plus the length of it? Yes, Your Honor, absolutely. Okay, and the counter, as I take it, is that it goes from seven to three, there's a repeat over here that there isn't, there's a slur over here, but that the basic progression is the same. Is that sort of the dispute that then you're saying, well, yes, that's sort of true, but the length of the notes is a difference, and the passing notes really are there, and there's a three at the end. I mean, is that kind of really the dispute here? No, Your Honor. Which is more important? No, Your Honor, the actual dispute, which isn't before the court, is defendants have shown that their song is in a major key. And if it's in a major key, there are no pitch similarities at all. But for the motion for summary judgment- And again, just help me, the pitch is, if you stay in the key that you're in, then their note is D and your note is E. Is that, I mean, I'm not, don't hold me to those numbers, to that name, but that's your kind of difference, and they say, well, but if you put it in the other key, then they are the same, and so now we're talking 7-3-3, not D-E-A. Well, yeah, we're using numbers because that allows the person who's reviewing it, without a knowledge of music, to look at it and see J-D-7-6-6-5-4-4-3 is not the same as Jan Smith's 7-5-5-5-4-4-3-3. So, and this is important, because, first of all, pitches are not protected. Your Honor is absolutely right about the difference between pitches and notes, and the example that we gave in the brief is that the pitch sequence in Rudolph the Red-Nosed Reindeer and Rock of Ages is exactly the same. They sound different because of the duration, and if you add the duration, you have two different melodies. Here, there is no claim of similarity in melodies. There's only a claim that in this approximately one measure that the pitch, some of the pitches, not even all the pitches, are the same. Okay. Now, because the extrinsic test, in this case, allowed us to challenge and get a court ruling on just the extrinsic test, that's why we didn't do discovery on access. Access is hotly disputed. Okay, but how about, I understand, how about originality, though, you didn't do discovery on that either? Correct, because- There's some flavor of that in the briefs. There is some flavor of that, and I think there's two parts to it. One is that we're not saying, they're jumping up and down and saying that plaintiff's work is really nice and unique and all that, it's original. What we're saying is the debate here isn't whether the plaintiff's song is original. The debate here is whether, if you compare the two works, that there is substantial similarity in protected expression. Now, I'd like to go back to something counsel said about how the district court assumed, you know, took a side on the expert discovery and the expert positions. That's actually not true. If you look through, if you just look through the district court's order, you'll see, repeatedly, the district court relied on Professor Stewart's transcription. We have our own transcriptions. We didn't rely on them. We put them into evidence, but we said, assume their expert is right. If you assume their expert is right, the pitches are different. The metric placement is different. The lyric is actually different, because in their lyric, the hook is dancing with a stranger. In our lyric, it's, oh, baby, I'm dancing with a stranger. And the context of it is that Sam Smith is talking about heartbreak, that someone left him and he isn't over it yet. Their song does not have that at all. The only similarity is this very common phrase, which is not only the name of another musical group, Dancing with a Stranger, but has appeared in some 40 songs as either a title or a lyric. So do you have any case, though, that talks about, I mean, I know you're saying these pitches are not similar, but they're somewhat similar. So do we have any case that tells us these identical lyrics with some similarity of other features is evaluated in some way? Any case like this? Yes. Skidmore. But Skidmore doesn't have the same lyrics. Well, it doesn't have the same lyrics. And if you're talking specifically about a lyric case, I would say yes and no. No in the sense that they don't mention lyrics, but yes in the sense that the lyric here is an admitted unprotected element. So we go back to the text. I understand that, but when you have this combination of unprotected elements kind of thing, it seems that the lyric is a fairly dominant feature, and there are a lot of words in the world. So it just seems like, I mean, maybe this is just a novel case, but how we think about the idea that they chose these words that out of all the words that could be, which are infinite, and put it with a pretty similar lyric, I mean, sorry, similar, you may not agree, but similar pitches and similar rhythm, then what do we do with that? That seems like what we're presented with here, and I'm just not sure what case guides us. With all respect, I do believe it is Skidmore, because this is a selection and arrangement claim. There is no claim that the lyric Dancing with a Stranger is protected. It's all over the place. Their claim is that if you step back and look at this as a selection and arrangement claim, they have elements that appear in both, public domain elements that appear in both, and the question is, under Skidmore, are they selected and arranged in a substantially similar way? And Skidmore says they have to be to protect the public domain, because other people get to write songs that have in one measure Dancing with a Stranger. There are only- But it's like, how do we even, I mean, maybe the words are Dancing and Stranger, and when we put them together, I mean, what case tells us how we look at this? It seems like they definitely put the words together in the same way, and I know that phrase itself is not enough, but then we have other features too that are similar, so why don't we get to some sort of substantial similarity? Because for a couple of reasons. One is that there's boatloads of prior art that had Dancing with a Stranger with the same metric placement, or similar metric placement, and similar pitches. There's one that- Can I interrupt you on that? I mean, is that a substantial similarity point, or is that a point about originality? It's a point about both, and if you were talking about, is, well, originality, when we use that phrase, we're usually talking about one size work. Is the plaintiff's work original? The work as a whole, or the unit of the work that we're talking about? Generally, we're talking about the work as a whole, is it original? Here, we could also ask, and there's a serious question, whether that one measure is original. We assumed that, we didn't challenge that. We then, instead, went to Gray v. Hudson and Skidmore, and said, look, this is a selection and arrangement claim. Skidmore teaches us to be very careful about selection and arrangements of unprotected elements because they take things out of the public domain. If we look at Skidmore as a guiding principle, and I want to say two things about it. First of all, counsel, respectfully, focuses on the deposit copy issue, which is not the important aspect of Skidmore. In Skidmore, the district court did not give a selection and arrangement claim. That case was tried, Led Zeppelin won, and the plaintiffs appealed on the grounds that there should have been a selection and arrangement claim. This court, sitting on bank, said that the evidence did not support a selection and arrangement claim. Now, if you look at what the claim similarities, by Dr. Stewart, by the way, in that were that they had the same five notes of a descending minor chromatic scale. They had the associated chords, which were the same. Similar pitches in melody, consisting of a combination of arpeggios, which are broken chords, and two note sequences placed over the descending chromatic line. A rhythm of steady eighth notes. The use of the same pitch collection. There were many more claimed elements. But they didn't have the lyrics. The lyrics just seem, it seems like that's a very recognizable and specific choice to put that just, to me, makes it very different than the Skidmore situation. But it's also the reverse. That's a common phrase. Judge Boggs pointed out several other alternative phrases. Those anyone can use. If someone else wants to use dancing with a stranger in a measure, guess what? There are only seven scale degrees. In a 4-4 measure, there are only four beats. By definition, you're going to have some of the same scale degrees. But the prior art, I mean, I don't know. I listened to all of exhibit, what is it? Whatever the exhibit was with the 54 songs. And none of them sound like this. But this one does. So I just don't, I mean, the closest one was the John Burr band. But it goes up again. So I just don't see this, what you're arguing. What your honor is hearing and what your honor is stating is the intrinsic test. How does it sound to a listener? That is not the extrinsic test. The extrinsic test focuses on objective similarities with expert testimony. We tried Stairway to Heaven. And I can tell you those two songs sounded similar because they were both played on an acoustic guitar. They both had a descending chromatic scale. And that was a danger. That people would say, well, you know, they sound kind of similar. But a musicologist came in and said, no, that descending chromatic scale, you have to take out, you have to filter out the performance elements. Guitars sound similar. By the reverse of that, if you've got songs that have the same pitch sequence, but they are in a different genre or the same genre, but they have synth pianos and one has real pianos or one is focused on guitars, they're going to sound different. Now, how they sound to your honor, I understand what you're saying. I listen to them too. I'm not telling you that if a jury listened to that, you know, they're going to say X or Y. And maybe they sound different. But that's the intrinsic test. The extrinsic test is experts coming in with an objective analysis. And we used Dr. Stewart's analysis. We used his transcription of that measure. But they have an expert who says it is similar. So why aren't we in a dispute that then goes to the jury? Because the district court judge did it right. The district court judge said, look, I'm looking at Dr. Stewart's transcription. I see the pitches are different. I see the metric placement is different. He then says, they're nearly identical. A judge does not have to give credence to an expert who says, look, this is it. And they're obviously different. And then put in a declaration saying they're nearly identical. Can I ask you, on the thin versus broad point, should a court decide that first? Or do we not need to decide that? What's your view? Your honor doesn't need to decide it. Your honors don't need to decide it. Because the district court assumed that it was not a thin copyright analysis. I think, actually, it is a thin copyright analysis. And I can explain why. If you go back to Mattel versus MGA and this idea of a red bouncy ball on a blank canvas, there's only a few ways of doing that. Well, there's actually a lot. The ball can be big. It can be small. It can be in one corner. It can be in another corner. It can be bouncing off the side or something. But there's a relatively limited number of things. There are, they don't claim similarity in notes. There are 12 notes in the scale. They don't claim similarity in notes. They claim similarity in scale degrees. There are only seven scale degrees. There's only four beats in a measure. So if you're looking at a measure and you're saying, how else could someone sing Dancing with a Stranger? It's very limited. That's why there's so much prior art with bits and pieces and sometimes larger sequences that appear. Because if you're going, no one's going to sing Dancing with a Stranger as stranger. The emphasis goes on strange. That's why it's on a beat. That's why the metric placement, at least in part, it's actually different. But at least in part, it's similar. Because metric placement deals with emphasis. Dancing with a Stranger emphasizes dance and strange. So if anyone is going to sing Dancing with a Stranger in a lyric, they're going to have pitch similarities. They're going to have rhythmic similarities. But those prior art in the exhibit don't. They do. There isn't one. And I'll give you this. I can see this. There isn't one that has exactly the same thing. But these two don't have exactly the same thing either. And also, Any other one in those prior art that's this similar? The one your honor mentioned is close. But I would also say, we have to keep in mind how people do selection and arrangement claims. You try and find as many unprotected elements as you can. They could have added, both are sung by a white male. Not protected. My god, that's part of the selection and arrangement. They could have picked all kinds of different things. They picked key. Key is not protected. But they picked key. Their problem is, they're in different keys. Even if Dr. Stewart is correct, they're both minor keys, but they're different minor keys. So they have picked things that are unprotected. And this can go on forever. We see this all the time. People pick things that are unprotected and say, well, it's a selection and arrangement claim. That's why Professor Patry, in his treatise, which we begin our answering brief with, says that. You're over your time. I still have some questions, but I'm finding this helpful. OK. No, go ahead. Well, I was going to say, Professor Patry says this is the last resort of people who can't point to melody, can't point to lyric similarity. They take bits and pieces of unprotected material and say, it's a selection and arrangement. That's where Skidmore comes in. Because Skidmore said, you can't do that. You are cheating the public domain. All you're doing is reconstructing various little things. There's three or four pitches that are different in these two works, three or four that are the same, but they're not consecutive. You could take context also. You were making a point about context. One of them is heartbreak. One of them is something else. A, is that a strong point for you? And is there some past basis? Because the analogy I would give you, remember the old standard, fly me to the moon and let me play among the stars? That's a heartbroken swain. If it's an astronaut with exactly the same words, exactly the same, would the context get you out of copying if it was the same words and the same tune? Yes, Your Honor, because meaning counts. We know that from, and when we're talking about lyrics, we're usually talking about the analysis in this court that goes back to, you look at theme, meaning, dialogue, all those kinds of things. Lyrics are treated as a literary work. So if you've got a lyric, you're looking at what the meaning is. That's what Shaw versus Lindheim. You look at what the meaning is of the word. So the hook can be separated from the, you might say, the literary work that it's embedded in? Well, I think if you look at the transcriptions, the actual hook of the Sam Smith song is, ooh, ooh, baby, I'm dancing with a stranger. And it follows the phrase about how he still cares for this woman. If you look at the phrase in context, in the plaintiff's work, it's completely different. He's talking about some woman being hot. And then she's dancing, but he's going to dance with a stranger. So the context is important. We don't put blinders on. We've got words. Words have meanings. And so the context tells you that these words actually are used differently. And that's important because Skidmore, again, tells us when we look at a selection and arrangement claim in Rentmeester 12b6, and the court said, look at these two photographs of Michael Jackson. This is different. One hand up, one hand a little bit lower. One leg up, one. These are different than selection and arrangement claims. And they're important because they ensure that we won't rob the public domain. Let me ask you, on some of the points you're making, which I think are important ones, the lyric is a common lyric. OK, well, if two people use this exact same phrase, it's not just substantially similar, it's identical. So OK, maybe on that metric, the test of substantial similarity looking only at that perspective is met. However, the phrase may be very common and not one that would be entitled to copyright protection, even with a very common musical arrangement backing it. But this doesn't show that the two things are not substantially similar. It may show, though, that it's not original. And so some of the arguments you're making seem to go more to that question than similarity. The way in which some of that. Unless, by the way, similarity has become a catch-all concept that means a lot of different things than what it sounds like. Because similarity, when you read it in the case law, you might think all it really means is let's compare the musicological elements to each other and go off of that. But it seems that it may import some other concepts of originality. Well, let me start by just briefly responding to the point that counsel made about Dr. Farrar saying that there's similarities in the melody. As a musicologist, what he is directed to do under the extrinsic test is identify similarities. He identified similarities and said, but they're everywhere and they're unprotected. So I wouldn't put credence in that. On your honors question, again, originality, that issue is whether their work is entitled to protection generally. The question now before this court is whether they admit these elements, the different pitch sequence, the different metric placement, the lyric. They admit those are all public domain. People are free to arrange those in different ways. And the test under Rentmeester, Skidmore, and Gray is have they been selected and feist, goes back to the Supreme Court's decision in feist. Have these public domain elements been selected and arranged in the same particular way? That is the safety against preventing someone else from doing Dancing with a Stranger using that lyric. If this court were to find that this claim is valid here, that would basically mean anyone who does Dancing with a Stranger could get sued again because there's going to be a scale degree or two that are going to be the same because there's only seven scale degrees. But none of the, I mean, I'm back to this 54 or whatever it was number of songs with the same lyric that don't have that. I still don't think that's right. None of those would have been banned. Well, I would actually take the exception with that. They've identified one that they think is the closest. And that, I think, has the same metric placement and some of the same pitches. Now, what happens to try and find something that because you pick all these, someone pursuing a selection arrangement claim picks all these unprotected elements, finding one that, finding prior art that has all of them is really, really hard. That was rejected in Johanna's music publishing, which we cited, by Judge Barot as a district court judge and affirmed by this court where Judge Barot said, you can't just say both songs have all the same shared and no prior art has all the same shared ones because that's just counting the similarities, the claim similarities of unprotected expression. Now, I would, if you go back to the prior art in Dr. Farrar's report. No, I think I'm. OK, I think I need to cut you off. We're way over your time. Thank you, Council, for the argument. I think we should put five minutes on the clock for rebuttal, please. Thank you, Johanna. Thank you, Adam. Very briefly. First, I heard some talk about how, oh, well, this is a small part of the song. Small parts of expression can, well, that's called a qualitative significance test. It's for the jury. Small parts of songs, even shorter than this hook, are routinely found to be significant for copyright and can be infringed. For instance, Hanagami, very short pieces of choreography that appeared in the game Fallout. The court said, yeah, looking at that, there's nothing that ipse facto says that that can't be protectable and that can't be infringed. Defendants have also said, and this is a related point, they said, oh, well, plaintiff's just picking scattered musical similarities. We brought a very tight claim. We just are bringing a claim for this hook, the earworm of the case. We are not arguing, oh, pulling from this verse and over there. These are not scattered similarities because the expression of the issue is protectable, but it's relatively short. There's not scattered similarities, I think it's kind of been recognized a little bit from the bench. The only thing with scattered similarities here is defendant's prior art analysis. They're picking one element that appears in one song and one element that appears in another song. And they're amalgamating dozens of songs together to say, well, everything in plaintiff's work appears somewhere in the prior art. Well, all notes in music have been used before. All basic musical building blocks have been used before. What we're talking about here is the selection and arrangement. And the selection and arrangement that we've used doesn't appear in the prior art. Now, the one song that they keep citing to, the John Burr Band, one thing that we did point out in our brief, so Dr. Ferrer said, oh, I think the pitch sequence and the melodic contour is similar. Well, I asked him, what's the key of that song in his deposition? And he said, well, I couldn't possibly determine that. It's too complex. So in reality, their claim that the pitch sequence and the melodic contour of the John Burr Band song, Dancing with a Stranger, was similar, is completely baseless. He never did any of the analysis to determine if the pitch sequence was the same in the first place. There's just been a... Well, I mean, one thing that's... I mean, you have, obviously, some good arguments on similarity. One thing that's concerning, though, about the position is we're talking about a common phrase and then a seemingly common sound in modern music that you hear from regularly. And so you put these two things together and all of a sudden now we're gonna say that anybody who uses this common phrase Dancing with a Stranger, or perhaps variations of it, alongside common music, would then not be able to do that without having to essentially pay royalty. Well, I would push back on the common music because I don't think that what we've presented is common music because it doesn't appear in its selection arrangement, in its combination. It doesn't appear in the prior art. It's simply not there. So if that was actually a real concern, you would... But do we know that? It seems like we know that with the lyric Dancing with a Stranger, no one found one like this. But did you look for these notes, sorry, these pitches in songs everywhere? We looked and Dr. Ferreira looked and Dr. Ferreira included Dancing with an Angel, Dancing with two syllables. So there was an extensive search done. And as your honors have listened, there's not really anything there. The concerns that the courts have about monopolizing common building blocks, that's valid. But what we've brought here is a very specific claim about a very, quite frankly, unique piece of music. The concerns about monopolization, in our point of view, are simply not present in this case. Because here, I'd asked you about what's your best shot and you didn't give me too much of an answer. Is this, as transposed, seven down to three, the briefing or the, I can't say who said what, but it seemed that in the texts, there are many statements about that being uncommon or unknown. Is that a fair statement of your side of it? I realized I had not quite answered that and I had written it down to address. Yeah, the melodic contour here, we asked Dr. Ferreira. And there are books, by the way, that identify songs just by their melodic contour, from where they go to where they end up. And he said, yes, this is a very uncommon melodic contour. And so we have, and we would contend with everything else that we have here, that we've created what is an expert dispute. It's just simply an expert dispute on the extrinsic test. And that the lower court acted, he stepped outside his role. He was acting almost as a musicologist, assigning significance or insignificance to various bits and pieces. Okay, well, this shift is insignificant. And we didn't really address this, but it's covered in the briefing. A lot of the times, he just referred to inapplicable cases, talking about different pieces of music. And he said, well, because that passing note was disregarded, it can be disregarded here. And we don't think that type of analysis is appropriate. And we think that does invade the province of the expert here. Especially where some of those cases were not even applying substantial similarity, they're applying a striking similarity test for access. Thank you very much. Thanks both sides for the helpful arguments. This case is submitted and we're adjourned for the day. All rise. Thank you. Court for discussion stands adjourned. Court is adjourned. Recording in progress. Recording stopped. Recording in progress. Morning, Kelly. Good morning, Blanca. Cards are good. Panel's good. Excellent. Thank you much. You are all set for court. Thank you. Under those facts, under DURU and this court's opinion on Obsepian, it's impossible to say that the possession for maybe a split second, maybe longer of that account number was the key mover or at the crux of the criminality of the... How long was the possession of it? They don't have any evidence with respect to that. What we know is that a few days later, Mr. Iroh provided Mr. Agwamba a different account number. Also, a couple of days after Mr. Agwamba received that Chase account number, he was communicating by text with Mr. Iroh and Mr. Iroh said, look, these aren't serious people because they were asking to get the account information, you should leave them. It seems a fair inference that he didn't possess it for very long, if at all, but the evidence just doesn't show anything. Why does that matter, counsel? The jury instructions, we're on plain error review? No, this is the... What I'm arguing right now is a sufficiency claim, but there is a jury instruction claim as well. So, there's just no evidence to establish the crux element that was set out in Dubin and that this court has dealt with in the possession context in Obsepian. They have to show that the possession was at the crux of the count to massive wire fraud conspiracy. And there's no evidence here to support that the possession had any effect. Right. I see an overlap in your two arguments because for me, given the nature of the scheme, I am struggling to understand why the possession of the means of identification doesn't go to the crux of the criminal conduct. Because it didn't affect the alleged wire fraud at all. That's why the government spends its entire answering brief arguing use in its 28-J letter at Artie's use. But that's based on other people's use. Did other people use account numbers to try to lull victims into sending their information? Mr. Gwumba didn't do... There's no evidence he did anything with the account information. There's no evidence he did anything other than receive it. So it couldn't possibly be a key driver of the criminality involved in count two. The government's never even tried to make an argument as to how it would be. They just dodged it, constantly arguing generically use and maybe uses to Mr. Duru. But Mr. Gwumba is charged with possession. On the theory of possession. Right. Well, it's the offense of possession. The 1028A has three offenses, use, possession, and I believe the third one is transfer. So they cite, for example, Parviz, which came out recently, that's a use case. Obsepian is directly on point, it's a possession case. In Obsepian, the government actually tried to come up with a theory as to how the possession could have somehow been a driver of the criminality. They said, well, they're hanging on to this person's identity in case they get audited later as part of Medicare, Medicaid fraud, so they've got it available. The court rejected that. The government's offered no theory here as to how Mr. Gwumba's perhaps split-second possession of the account information. It's questionable whether that's even possession based on the evidence. What kind of guidance does Dubin, the Supreme Court in Dubin, give us for what at the crux means? Well, they say it has to be the key mover of the criminality of the underlying offense, which here is the massive wire fraud conspiracy charge. I don't know how you could say that Mr. Gwumba's split-second, perhaps, possession of the account information could be the key mover of anything with respect to the Count II wire fraud. I would like to shift gears... On the Count II wire fraud, does the government rely at all on an aiding and abetting theory? Not from my side. I'd like to shift gears to the insufficiency on the wire fraud related to the lack of evidence on the agreement. Now, as a reminder... Before you get to that, could you address the intended loss issue? Sure. Because in my mind, I'm not sure you raised the objection below. Did you? Yes.  Well, they challenged... They said there's no loss to the victims here, and they submitted basically a forensic kind of analysis. Right, but that's just an objection similar to what they did in Hackett, where they objected to the way in which the calculation was made in terms of the numbers and whatnot. But there, they said it's a plain error review. Why shouldn't it be plain error in this case? Well, in Hackett... Let me try to get to the page number where it's got this... In Hackett, one of the things they specifically noted is that Hackett didn't object to the use of the intended loss provision, nor advocate for loss calculations based on the actual losses to the victims.  Here, Mr. Gwendolyn's counsel clearly advocated for calculating loss... Did you cite the record for that? I'm not sure I saw that. I don't have the record cite handy, but in a nutshell, he said there is no loss to any victim. There's no showing that anyone lost any money here. There's really no showing as to the background fraud. But there's a difference between objecting to the measure of it versus the way in which it's calculated. I mean, I guess there's a difference, I'm thinking. Well, he objected to applying that adjustment. Now, of course, it's claims that are preserved, not arguments, and I would suggest that Hackett's acknowledging that arguing that there is no loss here so that the adjustment shouldn't be applied is objecting to the adjustment. And whether or not you construe the arguments made here as different arguments... Well, don't you think that that's kind of what they did in Hackett, though, in that case? They made the same objection that apparently you all made below, but in that case, what the court in Hackett tells us is that's plain error review. Well, I just quoted the part of Hackett that I think suggests otherwise, but I'd just jump past that and say, look, under Supreme Court case law, it's pretty clear that if there is a plain error based on the time of the appellate review, that the third and fourth prong of plain error review when it's guidelines error rather than trial error, it is pretty much a given, and that's... The two Supreme Court cases are eluding me, they've been this side in the last five years, they pretty much said, look, when you're dealing with guidelines error, it's a lot easier to correct than trial error, and so pretty much we're going to find that the third and fourth prong have been met. So even if the court applies plain error review, and particularly in light of the impact of the sentence here, I think plain error review would be met. I would like to say something on the intended loss thing before I wrap up here so I don't step on my co-counsel's time. There's a legal argument, that's why intended loss should apply, but there's also the factual argument. And the factual argument is based on the fact that they have to show that Mr. Ogwumba purposely sought to inflict loss, and not just that he knew that loss might be inflicted on someone. The background information as to any fraud is basically just that Mr. Ogwumba is saying, hey, there are some unknown people who are engaged in some fraudulent activity that's undefined in maturity, which is unknown, that might want these accounts to transfer the money into. That certainly cannot establish that he himself purposely sought to inflict the loss. So the court doesn't even need to get to the legal error question. But if he knew the purpose of the bank accounts was to launder money that was stolen from people, how could that not have been his purpose? Well, see, that raises an interesting question. Is it to launder money, or is it to receive the money from the fraud? It kind of blended the two together. But he has to purposely seek to inflict the loss. So let's say, for example, we'll take the laundering approach that Your Honor took. Other people somewhere else inflict the loss. Is there a purpose to inflict the loss? He has no purpose to inflict it. He doesn't actually do anything to himself to inflict it. He knows that a loss is going to be inflicted, which under Manitou and under the guidelines adjusted and based on the Tenth Circuit Manitou's case, is not enough. At that point, he's just arranging to receive the money. He hasn't purposely inflicted the loss on anybody. That's slicing it really thin, counsel. It's the law. It's the language in Manitou. It's what the Sentencing Commission has adjusted so that we don't get into thought crimes. Oh, he intended, he hoped that loss would be inflicted on someone. Did he purposely inflict the loss? Are there no questions? Well, let me see. Don't worry about the clock for now. Let me make sure that all of my colleagues' questions get answered. Well, I'm sorry, briefly on the identity theft enhancement under 2B1.1, what's your position on whether we need to consider the commentary on what the meaning of victim for that is? Is this on the number of victims or on the number of victims? Well, I think either way the government loses because the guideline says victim, 10 or more victims. The guideline commentary says victim means someone who suffered monetary loss. Do we need to look at the commentary? Isn't the term victim pretty clear? I think victim is consistent with the commentary, that a victim of fraud offense is someone who suffered monetary loss. The government's counterargument is, oh, victim should include an intended victim. Well, or someone whose identity has been stolen. Why wouldn't that alone make them a victim? Oh, but that commentary that they cite to there say someone whose identity has been used, and there's no indication that Mr. Agumba used anyone's identity. Those, what they're talking about there then is the evidence found on his computer, not his communications with ERO and AROHA. And there's some evidence that he obtained some information related to people, but there's no evidence that he used any of that in any way. And your position is the information must have been used in order for the person to be a victim? That's what the guideline provision, that's what the commentary says. Well, that's what the commentary says. Yes. But if you don't consider it, then we're just back to victim and the offense here is, it says victim of the offense, and the offense here is wire fraud. And I think when people think of fraud being a victim, consistent with Miller, is that you are deceived and cheated. And there is no evidence that any of those people related to the evidence that's found on his computer were deceived or cheated in any way. There's no evidence he did anything with that information to harm anyone in any way. Thank you. Mr. Mendoza? All right, thank you. I'll put two minutes back on the clock when you stand up for rebuttal. Good morning, Your Honor, my name is Anne Boyce and I represent Mr. Giroux in this appeal. We've raised a number of issues in the brief, but at argument, I'd like to focus on three. But I'm certainly happy to answer any questions that the court has. In particular, I'd like to focus on the multiple conspiracies instruction, the 1028A issue, and then the minor role adjustment at sentencing. If I might begin with the multiple conspiracies instruction. Counsel, I'm sorry, if you wouldn't mind going to the crux question. And here's my question to you. Here, the fraudsters did use Giroux's account to successfully defraud someone through this romance scam. So isn't Giroux's account information right at the heart of wire fraud? I don't think so. And to the question that the panel asked earlier about what crux means under Dubin, Dubin said it has to be something that's not an ancillary feature. It has to be more than a causal connection. It has to go to what is fraudulent and deceptive. And I think here there are two issues. One, although the government has defended this on an aiding and abetting theory, the instructions didn't require them to find that someone else had used it. So the jury could also have convicted based on what they thought Mr. Giroux himself had done. And that is a fundamental problem here. When it goes to the crux again, the fact of who the bank account was wasn't what was at the heart of it. The heart was Mr. Featherstone, who engaged with the victim DJ, represented himself as someone engaged in romance. So while the bank account was a vehicle and it was ancillary to it, it was not the core of the fraud. The fraud was Mr. Featherstone representing to DJ that he was in love with her, that he needed this money, and the bank account was simply a vehicle, a way of doing that. Thank you. You're looking at the question in a fairly narrow way, but as for conspiracy charges, the crux of the conspiracy charges is the agreement itself, right? So does it matter whether someone actually used it? As long as the possession or use of the means of identification goes to the heart of the agreement, doesn't that satisfy Durbin? I don't think so, Your Honor. And first, the government, although they alleged it as a possession, use, and transfer case, the core of it was really about use, and that's how they argued it in closing. But as I said, the instructions, while they would have allowed for conviction on the aiding and abetting series, they didn't require it. The instructions said that you had to find that a person, which could include Mr. Duro, had used their identification. The fundamental problem with that is both the process is too – But you said the core of it. That's not the way it was charged. Admittedly, I didn't go through carefully the government's closing instructions, but as I read the indictment and the charges, it really is about a big group of people conspiring to commit wire fraud and carry out multiple ways of defrauding people, essentially. And what I heard you say, and I want to make sure I understand your argument, is that the government narrowed their case to just the use of means of identification during the course of the trial and in closing. That's what you're saying? I think they did. But I think even if they had not, it still doesn't go to the crux. The bank account in this particular case, the core of the fraud, even if we reduce it to the who, the who that really mattered here was Mr. Featherstone or the individuals who were having contact with the victim. Mr. Duro, whose involvement was tangential and simply provided a bank account under his own name, that failed under 1028A for a whole host of reasons, not least because it is not identity theft to use your own identity. And that collapses at the – But wasn't the victim told that the bank account was Anthony Featherstone's? That's why the victim sent the money to that account. And why isn't that enough to show that Mr. Duro aided and abetted the use of that account? I think because – I will confirm what they said in the record, but my understanding is that when you – if you look at what was actually argued, what they said was that it was just the creation of the account. And so what the government said, they did so without legal authority because they used it and possessed it and transferred it in connection with the scheme to defraud. And the aiding and abetting, again, focused simply on this idea that it could be in relation to. So the jury wasn't required to find that. So we have two challenges here. We have both the sufficiency challenge, like Mr. Aguemba, but we also have the jury instruction challenge. And we think that both were adequately raised in this case. And I also addressed the multiple conspiracies instruction because I think that goes in part to the gentleman's question. The other problem here, and this was squarely preserved, but this was raised by both defense counsel, was that there was – as the government effectively admitted, when they put on testimony that this was a bowtie conspiracy, they didn't have the evidence that this was a single conspiracy or even two separate ones, money laundering and wire fraud. In fact, if you look both at the fact that Mr. Aguemba, his only connections were with middlemen who Mr. Duro had nothing to do with. Mr. Duro, by contrast, had contact with only one middleman, again, who Mr. Aguemba had no connection with. These were a whole host of conspiracies that were essentially piled together. And as the government's own agent testified, it was a bowtie. But a bowtie doesn't meet the requirement that you actually have a rim around a conspiracy. It simply doesn't. And here they raised the request for the multiple conspiracies instruction. It was squarely preserved. The court denied it without explaining why, and that violated their rights on the jury's behalf. Can you talk a little bit more about what you think is evidence of multiple conspiracies? Because the fact that they don't know each other, to me, isn't dispositive at all in determining whether it's one conspiracy or not. Sure, I'd be happy to. So first off, generally with a censor, there has to be something that connects these. And here their argument was that there wasn't. They said there was a bowtie, that there was a central core, but nothing connecting the spokes. And that there's no evidence that Mr. Drew, for example, knew of the full scope, that his understanding of the conspiracy was that his benefits depended on its success as a whole. I would also point to the fact that when they talked about the activities with his brother, which came significantly later, which had no connection with the events with DJ, the government described that and said it was a pivot, which suggested, again, this is a separate set of activities that aren't connected to each other sufficiently to be a single conspiracy, let alone the conspiracy that was actually charged in the indictment. And that is one of the fundamental purposes of giving a multiple conspiracies instruction is to make sure that if someone is convicted, they're actually convicted of the crime with which the grand jury returned an indictment. If I might, actually I'm running short on time, if I might address the issue of the minor role adjustment. Because, again, that was one that was raised by Mr. Drew, his counsel, and the district court rejected it without explanation, didn't even address the fact that it was raised. We think that that is error under clench for the failure to explain, and it was also failure and error in terms of the results, because it is something that should have been given here. If you look at Dominguez-Caicedo, it talks about the three steps that the court should take, none of which it took here. So it's the look at all the identities, all the individuals for whom there's sufficient evidence. In this case, there were many, many, many defendants who were indicted, and it's right to government's argument that this court should only concern itself with those who are convicted. In fact, this court has been clear that it is not limited. What it has to look at is was there sufficient evidence of others' involvement and their comparative degree of culpability. So what exactly did the district judge say with respect to this objection? He said nothing. Well, how did he overrule it? He just didn't apply it? He just didn't apply it. He adopted the PSRs. Was it discussed at sentencing? It was discussed when they compared, for example, Mr. Dewar's counsel raised the sentence that one of the middlemen got, raised the sentences that others had gotten, and talked about Mr. Dewar's comparatively minimal role. And it was also raised because it was addressed in the addendum to the PSR, so it was also raised in an objection to the PSR. I think that was more than sufficient to raise the issue, and the court simply didn't address it. The court didn't even address the 355-3A factors until the government asked it to, and even then did so in passing. We think that that's not enough under clench, but even if it had, there's no way to justify it on this record where Mr. Dewar's involvement was so tangential, so limited in time compared to the scope of the conspiracy, so limited in terms of the number of victims involved. The only one here who was specifically addressed was DJ, and so we think under that it was error, and this court should vacate a sentence. I see. I'd like to reserve the one minute I have left of my time, if I might. I'll give you two minutes back. Thank you. Good morning, Your Honors. Dubai for the United States. The defendant's challenges to their 1028-A convictions must fail because the jury instruction provided at trial was not error, much less plain error. Well, hold on. Dubin was decided after, and the model jury instruction was then amended to include the crux language. Why not send it back to the district court, have the jury make a decision as to whether or not that possession or the use of it was at the crux of the criminal conduct? Simply put, the evidence was sufficient to sustain the conviction and satisfy the crux standard, and there is no reasonable probability that the verdict would have been different given that the crux standard was supported by ample evidence at trial, evidence that was undisputed. Hold on. So the jury was given an instruction saying that it could be related to, not just at the crux of, but related to the criminal conduct. Related to is kind of broader, you would agree. Would you agree that that's a little broader than at the crux or at the center? Though that may be true, Your Honor, the 9th Circuit case in Conti is clear that the analysis here hinges on whether or not there would have been a reasonable probability that there would have been a difference, even assuming the crux standard is an element. So why isn't there a reasonable probability that that would happen by a jury, by any one juror? Yes, Your Honor. First and foremost, there was ample evidence supporting the fact that the means of identification that formed the basis for the 1028A convictions were central to accomplishing the object of the wire fraud conspiracy. Walk me through that with Duro. Yes, Your Honor. So just back to Duro. He was charged with aiding and abetting another individual's 1028A violation. So in that case, there was a principal, which included co-defendant Igbokwe, who testified at trial, and the aider and abetter was defendant Duro. Co-defendant Igbokwe testified at trial, and the evidence presented at trial, including his testimony and corroborating documentary and other testimony, supported the fact that every element was met with respect to defendant Igbokwe and his use, transfer, and possession of defendant Duro's for the 1028A conviction as to Duro. In that case, that included the Kruk standard. There was no dispute at trial that the fact that the U.S.-based accounts were central to accomplishing the object of the conspiracy. So, for example, the lies that were told to the victims online was that this money was going towards somebody who was either based in the United States or a business that was based in the United States. So given that particular situation and the modus operandi of the conspiracy, the fact that these U.S.-based accounts, including the U.S.-based account that is the basis of Duro's 1028A conviction, was central to achieving the object, ultimately tricking the victims into sending the money or leaving the lies that they were told, was absolutely central. And this was indeed the Ninth Circuit's holding in Parvis, that the fact that a medical practitioner Does it matter, though, that Duro's account wasn't actually used? As I understand it, well, it was used, I guess, initially. The victim sends the money to his account, thinking it's Anthony Featherstone's account, and then the bank wires it back or sends it back. How does that affect the analysis? Not at all, Your Honor, for the following reason. The conviction was based on a use, possession, or transfer. Igbokwe committed all three, and Defendant Duro, aided and abetted, with the criminal intent, act to all three. And he did so in the following ways, based on the evidence at trial. First, Codefendant Igbokwe explained and testified at trial that he explained the fraud scheme and the money laundering scheme to Defendant Duro. Duro then, in response, registered a fake business in the name of PD Enterprise. Then he used that documentation to open a bank account, both a Bank of America account and the Wells Fargo bank account that is the basis of this conviction, for the purpose of giving it to everybody who needed it. And that everybody was referring to the myriad of other fraudsters involved in this conspiracy. And so he not only opened that account, but then sent that account information, including the account number and the name, to Defendant Igbokwe. And then the two coordinated about sending that account information to the various other fraudsters so that it could be made available to receive any fraud money that could be coming in. So throughout all of this process, and that doesn't even include the specific actions he took with respect to one of the victims who testified at trial, Denise J. I'm just concerned that this information was not given to the jury and that the jury could make the decision of whether or not you're right, right? I mean, I think you make a compelling argument, but that's the kind of argument that you'd want to make to the jury with the jury instruction, the correct jury instruction. That's sort of what I'm having a problem with. Your Honor, respectfully— So we're on plain error review on that question? Yes, yes, absolutely, Your Honor. And so to answer your question directly, we believe we did make that argument. So in the closing argument, Government Counsel stated that these bank accounts were important because they helped to trick the victims into sending money, believing that the lies that they were told matched up with the information provided in the bank account. Furthermore, the jury instruction was accurate as to the aiding and abetting. Contrary to Defense Counsel's proposition, there was no concern, really, based on the instruction, that Defendant Duroo would have been convicted of being the principal in this scheme. The instruction was very clear that this was under an aiding and abetting theory. And as to Your Honor's point also, yes, we are under plain error review. And critically, the defendants have the burden of proving prejudice, that their substantial rights were affected. Based on the ample evidence provided at trial, the accurate jury instruction provided as to this count as to both defendants and the fact that Government Counsel made this point in the closing argument, there is simply no reasonable probability that the outcome would have been different had the specific description of the element during and in relation to the wire fraud conspiracy, specifically the Krux standard, had been provided. I'm tracking you with respect to Duroo, but Agwumba is, I think, a little differently situated, given that he possessed that Chase account, the 5027 Chase account, after the specific fraud that we're looking at. His situation seems closer to the defendant in Osepian. What's your response to that? Your Honor, respectfully, we do not think that the record supports that proposition. And I would like to correct the prior statements that might have been made or the suggestion that Agwumba possessed this account in a fleeting manner. To be clear, he possessed this account while he was facilitating a $2 million fraud that was actively ongoing. So the possession was based on a text message exchange that was dated June of 2017. The cell phone from which these text messages were retrieved was seized by the government on or about August 2019. And this was testified to at trial by Special Agent Kimberly Anderson, who said that that's when the phones were seized at the time of the takedown and arrest of the various defendants in this case. So that means evidence at trial showed that defendant Agwumba possessed, first of all, this account for at least a period of two years. Furthermore, critically to your point about the contemporaneousness, about when he possessed the account with the ongoing fraud, the order of operation went as follows. Defendant Agwumba became aware that there was a fraud scheme that may have led to a $2 million fraud money dropping into a bank account. When he became aware of that, he specifically contacted co-defendant Valentine Iroh and said that he needed a Chase bank account that could receive $2 million. In response, co-defendant Iroh then sent the bank account number, as well as other bank account information, to defendant Agwumba and said, go ahead. After that exchange, in the same text chain, the two conferred about the appropriate percentage cut that they would each take to compensate them for their roles in this conspiracy. And after they had an extended exchange about the appropriate percentage cuts that they would agree to, they agreed to use the account and then keep in touch. And it is in this exchange, during this exchange, while the fraud was active and ongoing, that defendant Agwumba received that bank account from defendant Iroh. The 5027 account? Yes. Yes, it is, Your Honor, in the name of Minerat Timensre. And this is when he received that account for the purpose of passing it on to the fraudster, who would then give it to the victim so that the money could be deposited in that account. That didn't happen? There is no evidence in the record that the fraud was successfully completed. However, we don't believe that that is necessary to sustain the conviction for the 1028A violation. And that is because the crime simply does not require completion or success. The crime is the possession, possession of the account information, which there clearly was contemporaneously with the ongoing fraud and in a way that was central to persuading the victim to send the money to complete that fraud. Was the 5027 account information given to the victim? There is no evidence in the record to show that it necessarily would have been given to the victim. But once again... And wouldn't that be necessary for it to be the crux? Not necessarily, Your Honor, because again, the crime here was the possession in connection with the wire fraud conspiracy. To be convicted of wire fraud conspiracy, the fraud scheme may not be successful. And so completion or any further substantial steps was not necessary, given all the evidence presented at trial, namely that Defendant McBokey, in order to further this wire fraud conspiracy, sought out and acquired that specific U.S. bank account information for the purpose of effectuating a successful wire fraud scheme. Under those circumstances, it does go to the heart. That is central to accomplishing the object. And that is exactly what this Court decided in Parvis, where the fact that the letter was signed by a medical professional was an important part of achieving the ultimate outcome. Well, but the evidence in that case, as I understand it, was that the Defendant would not have received the child's passport absent the letter. Here, I mean, I hear what you're saying about the fraud doesn't necessarily need to be complete, but we're stuck with the et de crux language that the Supreme Court has given us. And, you know, what does that mean in a scheme where the fraud wasn't complete? Well, Gubin's language is actually helpful. The standard is whether or not it was used in a deceitful or fraudulent manner or possessed in a deceitful and fraudulent manner, in this case with Agumba. And it was possessed in a deceitful and fraudulent manner because it was possessed with the intent to deceive, with the intent to defraud, with the intent to perpetrate the fraud scheme and to help it become successful. And in Gubin, that is all that is required when the underlying predicate crime is one of fraud, as it was here for a wire fraud conspiracy. Turning next is the question whether it's helpful to carry out an object of the conspiracy or is the question that it's helpful to carry out the agreement to commit an object of the conspiracy. So it's a conspiracy charge, right? And what's criminal about it is an agreement to basically accomplish one of the objects that's laid out. And then, you know, I don't think anybody's disputing that overt acts were committed along the way. Precisely, Your Honor. The predicate crime here for the 1028A conviction was not substantive wire fraud. It was, indeed, wire fraud conspiracy. And therefore, the fact that it went towards helping the accomplish of the agreement to commit the wire fraud, the conspiracy, is sufficient. And given that the predicate was conspiracy, this account was absolutely central to helping to accomplish the object of that conspiracy regardless of whether or not it was successful. Can you address Ms. Voigt's point about multiple conspiracies? Because in a big one like this, sometimes it gets very confusing because sometimes there are little conspiracies within the conspiracy. So as I understand her argument, the government's argument is that this was a bow tie. So the fact that there may be a central hub doesn't necessarily make this one conspiracy rather than multiple conspiracies. How do you respond to that? The evidence at trial proved that the spokes were connected, and here is why. One of the jury instructions provided, so the defendant's theory of the case, if it were such that the spokes were not connected, the jury instruction regarding the Lapierre scope and benefit test covered that theory. And they covered the theory by saying that if you have communications, if the defendant has communications with one individual, doesn't know about the rest, however, has reason to believe that that person that they are communicating with is also talking to other conspirators, and the defendant has reason to know that the benefit that individual would receive depended in part based on the success of the entire venture, that is sufficient to be convicted of that conspiracy. And the evidence at trial was ample. With respect to defendant Agumba, he talks about in his messages how he's talking to the fraudsters. And though he doesn't communicate directly with any money mover, he surely knows that they exist given the fact that he is looking for these accounts, and from the middleman, including Valentine Iroh, was he the same defendant. But does the government have to prove that Duro specifically was the money mover for the schemes that Agumba was involved in, not just a generic scheme within the conspiracy that may have had other participants? No, Your Honor. The case was clear in the Ninth Circuit that each individual does not need to be aware of all of the other conspirators in the conspiracy or every part of the conspiracy. In fact, in order to be entitled to a multiple conspiracies instruction, there must be some evidence presented at trial that the defendants were involved in a separate, unrelated, independent agreement compared to the overall charged conspiracies. That was simply not the case here. All of the evidence related to the overall wire fraud and the money laundering conspiracies, this argument that they may have played a smaller role because they were involved in a subagreement but didn't know about every single part of the conspiracy or every other conspirator simply isn't sufficient to undercut the conspiracy conviction because such knowledge is not required. And here, specifically, the scope and benefits test encompasses why that is the case. And the evidence showed that each defendant, Defendant Duroo and Defendant Iguamba, knew or had reason to know that there were other conspirators involved, including the ones that they did not speak to. I want to ask you a question about the sentencing issues and the 10-victim enhancement. With regards to those, can you indicate where you find 10 victims in the record for Iguamba and for Duroo? Because I couldn't. Yes, Your Honor. Specifically, we'd be happy to provide the excessive record citations, but if I may describe them generally. With respect to Iguamba, in his laptop that was seized in 2019 at the time he was arrested, those laptops contained victim report information, victim reports that were downloaded as a result of having infected victim computers with malware, specifically the malware that was found on his computers at the same time, including the LokiBot malware and the NanoCore remote access Trojan malware. Expert testimony at trial by Special Agent Greg Walker went to the fact that these reports- But I need you to focus me on what the actual loss was. That's what I need you to focus me on. Yes. On the victim reports at the bottom of the page, and the government's brief provides some citation to this, at each victim report there were 15 victim reports included, and each of them included a host of different information, including the name that was on the user account of the computer that was infected with the malware, and in many cases the specific account information, like account usernames and passwords, that were stolen from that victim computer. And at the bottom of that report it says total number of information, and there were at least 10 reports where that number was one or more, where the specific identifying information was stolen. It lists in that report specifically some e-mail addresses as well as passwords of various different accounts.  Still, let me ask you the question again. Yes. Where's the actual loss? Tell me what you see as the actual loss so that I understand your argument. Yes. The actual loss is the information, the private information, from those computers that were infected with the malware. The possession of private information is the actual loss that the government claims is actual loss. Yes, Your Honor. Yes, Your Honor. And in this case we believe that the plain language of the- Do you have a case to support that position? We rely on the plain language of the meaning of victim, Your Honor, as this enhancement is applied. Do we go to the notes for that? No, Your Honor, because there is no genuine ambiguity as to the word victim. Surely in cases the fact that the personal information was stolen would qualify you as a victim. I think that the commentary guidelines actually highlight why it shouldn't be applied because the ordinary common meaning of victim includes people who may not have suffered monetary loss. That is especially also the case when we're talking about a conspiracy here once again. And so- So just so that I understand- Yes, Your Honor. Your view is the possession of the information that is private should be considered actual loss. That is true, Your Honor. It should be considered actual loss and also, of course, there was additional information that would constitute intended loss as well when he infected those computers. But yes, Your Honor, that is correct. That is the government's position. Do you have to show actual loss or either actual loss for people whose means of identification were used without lawful authority? Either, Your Honor. Under either theory the government would prevail. Is the government limiting itself to just actual loss or is the government also relying on that second part? The government is also relying on both. Yes, Your Honor. Can you explain to me how that's the case? Yes, Your Honor. So the specific information stolen also goes to the means of identification. So also when you look at the victim report, and I don't want to list specifically the victim information here in this particular setting, but it does include specific email addresses, specific passwords, and Special Agent Greg Walker testified at trial that these were the types of information that if you were able to use to log in to these victim accounts. So, for example... Is there any evidence that that happened? That the actual logins happened? No, Your Honor, but we don't believe that's necessary in order for you to become a victim when your information was stolen clearly with the purpose of ultimately accessing, without your authorization, these private, sensitive bank email accounts. So the evidence seems a little bit more compelling on the question of number of victims for Igbubu versus Duru. Can you go through Duru and the 10 victims or more? What evidence do you have that it's more than 10 victims? Yes, Your Honor. The government does note in its answering brief that five of those victims did suffer actual loss, and this is supported by the financial records, including the MoneyGram and Western Union transactions, where his identification is associated with the amount of money he picked up. Counsel, I can count nine. Give me the 10. Yes. We do note that the remainder of the victims were targeted. They did not suffer actual loss in those cases. That being said, the government's position, once again, is that the meaning of victim is clear, and here they were victims of the conspiracy, not the substantive fraud, necessarily. So on that, do you have to rely on aiding and abetting theory? No, Your Honor. We need not because, actually, in these particular cases, these victims were all identified in connection with Defendant Duru's specific communications in connection with the conspiracy, not necessarily the 1028A aiding and abetting charge. So on that theory, every member of the conspiracy, regardless of how significant the role, is then responsible for all the victims identified within that conspiracy under the government theory? Not necessarily, Your Honor. The government actually could have attributed many more victims to Defendant Duru, but it chose to limit itself to the victims about whom the Defendant Duru specifically discussed in these messages and tried to collect money from. And sometimes we had financial records that supported that those actual losses occurred, and sometimes there weren't those records. However, in those six cases where those financial records did not materialize, the victims were still targeted as part of this wire fraud and money laundering conspiracy because he specifically discussed with co-conspirators helping to receive that fraud money and then to move it around for the purpose of hiding where the money came from. As a result, if we're counting victims of the charged conspiracies and the conspiracies for which Defendant Duru was convicted of. Look at the guidelines specifically note for, and this is at the crux of my problem. When I look at the sentence enhancement, note 4E says, and I'll move on to subsection, double I says, in order to find the 10 or more victims, you look at any individual whose means of identification was used unlawfully or without authority. So how is that the case? Yes, Your Honor. Simply put, we need not turn to that commentary note or any commentary note, and here is why. Not only is the word victim not genuinely ambiguous, but other portions of the sentencing guidelines help to illuminate that these intended victims should be encompassed. So for example, in section 1B1.3A3 discussing the scope of relevant conduct, it includes not only the harm resulting from the offense, but harm that is the object, the object of the offense, of the actions or inactions. And here, so the guidelines, and this is the guidelines, not a commentary note. So the guidelines clearly contemplate in situations like contemplating harm or victims, the object of the crime. And here, the object of the crime was potentially targeting these individuals for the purpose of stealing their property or stealing their money or identification. Because the guidelines is clear between the plain meaning of victim combined with the plain meaning of object of the offense as outlined in 1B1.3A3, we believe that the commentary notes need not be referred to. That being said, even if the court were to find that in some cases, the guidelines language were genuinely ambiguous with respect to at least the loss amount, the commentary note would support the government's position as well since it defines loss as the grader between actual loss and intended loss. All right, thank you. Our questioning took you over time, but let me make sure that my colleagues' questions have all been answered. Thank you very much. Let's put three minutes on the clock for each of you. Thank you. Judge Mendoza, the government in its answering brief relied on exactly that note that you just read, 4E, and I responded to that, and that was on page 90 and 91 of their brief, and I responded to the reply brief, and I said it was wrong for exactly the reason you just said. I think they've not only waived their counterargument now, but they've led me down the wrong path. I'm responding to the wrong argument that, by the way, was raised in about half a line, like several arguments in this respect. A lot of times the court won't even consider arguments that are raised so briefly. I responded to it. Now they're jogging to a different path. I don't think that that's a viable way to approach this process. Regarding the 1028A offense, the government pretends that there is some sort of clear picture into some $2 million fraud that Mr. Agwemba was involved in. That is just not true. What the evidence of that is a series of text changes between Mr. Agwemba and Mr. Iroh. It starts off with Mr. Agwemba saying, Nowana find Chase Wire 2M, that the agent construes is that someone's looking for a $2 million account, Chase, that received some funds. The Iroh responds with the Chase account. The next day Agwemba writes back and they say, These people want online access to their account. Well, that's just nonsense, right? They're not going to give them online access to their bread and butter accounts for doing this sort of thing. The next day Agwemba writes and says, I never heard from the Lundin guys, presumably the Nowana who wants the 2M, but some other guys want an account and they want online access. Iroh responds, Leave them, sir. They're not serious. That's the evidence with respect to some $2 million fraud that Mr. Agwemba, according to the government, is in the thick of. It's nonsense. It may well be, it seems quite likely, that they're trying to rip off Agwemba by getting access to some account, not that there's actually any fraud going on in the background. But we really don't know. We just don't know. Now, the government related to that conduct, they asked for possession instruction. That is at CR 1187 at 67. The judge gave a possession instruction, 6ER 1180-81. At trial, even under the old relation type standard, the government couldn't even make an argument as to how Mr. Agwemba's possession of that account number for some unknown amount of time related to the wire fraud conspiracy. And instead, this is at the root of the prosecutorial misconduct claim, they argued that someone else's use of that account in some totally unrelated context with which Mr. Agwemba was not involved at all made Mr. Agwemba guilty of the possession offense. And that is at 6ER 1104-1105. They just can't. And this is a possession. This is not a possession conspiracy. It's a possession offense. How is his possession of that account for some brief unknown period of time related to something in the background? It may have been a fraud. It may have not. Who knows? How is that at the crux of the massive wire fraud conspiracy charged account too? There is no plausible argument for that. Zero. And that is a sufficiency claim, and that is reviewed for de novo. But as far as the jury instruction claim, even if you review it plain air, the government's argument with respect to this issue at trial was that Mr. Agwemba was guilty of possession based on someone else's totally unrelated use of the account. That's just flat-out wrong. That was flat-out wrong under the law at the time. It's flat-out wrong now. It was grossly misleading to the jury to suggest that it didn't prejudice Mr. Agwemba, belies common sense. Of course it did. All right. Thank you very much, harmful. Thank you. I might address three points in this level, first with respect to the 1028A claim. I'd like to start by saying I think there are two issues that are being sort of conflated. One, whether Mr. Duro's use of his own identity could be the basis for the 1028A conviction. And second, the idea of whether this goes to the crux. And the Supreme Court specifically rejected the idea that in relation to could be this sort of capacious language that it was argued and charged as below. And I'd like to read, if I could quickly, what the government said in closing. It said, it's enough that the bank account was used in connection with a criminal purpose, and here the criminal purpose was the wire fraud conspiracy. That's at ER-1105. It said, and they did so without legal authority because they used it and possessed it and transferred it in connection with a scheme to defraud, as well as overall wire fraud. That's at ER-1107. That is not the sort of crux requirement that the Supreme Court required him to do, and it's not what the current model instruction reflects. And in fact, what the court told the jury, and this is at ER-1178, was that it required simply, I'm sorry, that is ER-1180, that it simply required that the person did so during and in relation to the offense of conspiracy. That is simply not the sort of crux requirement that the Supreme Court articulated that was required, and to Judge Mendoza's point, that is something that should have gone to the jury. It didn't, and therefore this court should reverse. The fact that this was prosecuted under an 80 in the betting theory doesn't preclude that because the court told them that they could be, that Mr. Drew could be convicted even if he did not personally commit the act, not only if he did not personally commit the act. With respect to the multiple conspiracies instruction, if I could address the point. The test here, because we've preserved the issue, under Tarun Palma, if it is possible, so just is it possible for a jury to find that there were two different conspiracies that existed, then the district court has to give the instruction. If not, is it more likely than not? It's not the same as a sufficiency challenge. The question is, is it possible? And the answer here is yes. Mrs. Court looks at the factors set forth in the Barrow, the nature of the scheme, the identity of the participants, the quality and frequency and duration of the contacts, and the commonality of the time and the goals. Remember this, of course, was a scheme that apparently included business enterprise compromise, malware, romance fraud. There was very little core to that, and to Judge Nguyen's question initially, it does require that there be some connection between the spheres. If the spokes function independently and the only core is the middleman, as it was here, and as the government's own agent's testimony confirmed, then the multiple conspiracy instruction should have been given, and that should have been an issue for the jury to decide. Finally, with respect to the 10 victims, we just note that we think that that was simply not met here. We think the math doesn't add up to 10 victims. We also think the math doesn't add up on the intended loss, and we think that Mr. Derush has gotten a minor victim adjustment and that the court should address those issues. The court has no further questions. I see I have five seconds, and I will sit down. Any questions? All right. Thank you very much, all counsel, for your very helpful arguments in this case. The matter is submitted and will be in recess until tomorrow morning. All rise. This court for this session stands adjourned. Recording stopped.
judges: Boggs, FRIEDLAND, BRESS